All right, we're ready to begin our argument in our third case, United States v. Seignious, and Mr. Cheslock, whenever you're ready. May it please the court, my name is Arthur Cheslock and I represent the appellant Mr. Seignious. I come before the court respecting the issue with regard to Mr. Seignious, and the court requested additional briefing regarding the 3664, the Mandatory Victims Restitution Act. In part, whether the losses ascribed to Mr. Seignious and the conspiracy that he was a part of were in fact properly addressed by the court, and in fact whether they were proven to be attributable to the conspiracy, to their pattern of conduct for which they were responsible. The appellant maintains that with regard to that particular issue, that the district court failed to sufficiently explain in its memoranda submitted, two of them, that the losses, the actual losses, were in fact explained as being attributable to this particular group. Specifically, those specified. Yes, Your Honor. As I understand it, there was no objection to the application of the 3664 provisions. There was no objection at trial, is that correct? That is correct, Your Honor. So we review only for plain error? That is correct. Thank you. In this particular case, Your Honor, in fact, the government brought forth to testify regarding the black accounts, those designated as black, and let me just back up, the losses attributed to the conspiracy are designated in the spreadsheet as blue, red, and black. Those that are designated blue were those where the government maintained that they had direct information attributing those particular losses to the conspiracy. Those attributable as red are those which were blue and where the account numbers were found in the various dumps or records maintained by the conspiracy. Those that were black were account numbers but where the losses, other than being in the dumps with regard to that conspiracy, could not be essentially attributable to the conspiracy. When the district court approached this question, basically in restitution, you're supposed to look at the defendant's situation and you're supposed to look at the victim's situation and you're supposed to gather information as to both. And that was a little bit difficult here, wasn't it, with 2,000 different credit accounts? How is a pre-sentence report or anything expected to compile a dossier or whatever on 2,000 different credit accounts which were defrauded by this credit card? It's a conspiracy. Well, in part, Your Honor, the account numbers and losses attributable to the group, and there was only the issue regarding those that were designated as black. Most of those, if not all of them, in fact, all of them were attributable to... Could you move your microphone down just a little bit? I think it'll... Yes. Just a little. Is that better? No, now raise it. Oh, okay. All right, there you go. I think you got this right. Those were all attributable to the organization, although it was conceded that they originated, were purchased from sources in Vietnam, Russia, China, and there was no designation as to where those losses occurred. The organization had the account numbers, but the question is whether those losses could be directly and proximately attributed to the group. The location where those losses occurred was never provided nor addressed by the court. They were attributable to? Well, we would know, or at least there would be some evidence with regard to their association with the group, if those losses occurred in those states where the group operated. Was that raised at trial? Yes, it was. It was. In fact, the agents were addressed and were requested... I mean at sentencing. Yes. The issue, and that was where Agent Windash testified, and the defendants maintained... Let me ask you this. How were the... If we're here on plain error review with respect to the procedure followed in imposing restitution, and also, I suppose, whether there was evidence to support the restitution schedule. And so one of the things you have to ask is whether the substantial rights were in any way affected. And the restitution schedule had him paying $25 a month while on supervised release. I'm not sure that that is an especially onerous thing. And then the amount of loss that was attributed was $1.2 million. And the defendant's own counsel agreed that, as I understand it in the sentencing hearing, that the losses exceeded $1 million. The government's estimated loss ran as high as $10 million. But the figure that was settled upon was $1.2 million, which was somewhere in the ballpark of what the defendant's own counsel had agreed to, which were losses to the record. I mean, there were losses over $1 million. Yes. And it is... So how is... I don't understand. I mean, what do you expect... What would you expect to get on remand that you don't already have? You have a stretched out restitution schedule. You have a loss figure that's really conservative in terms of what may well have gone on. You have 2,000 credit accounts. The district judge has an extensive spreadsheet to deal with that. The statute says... Here's the district court, some flexibility here. It says, do what you can do with respect to getting information on the victims and the defendant to the extent practicable. I mean, I just don't understand in real life terms, in sort of practical terms, we can debate theoretically the need for a remand. But what do you really expect to get out of this that's any better than you already have? You know, there's a guilty plea underlying it. Well, the only issue, Your Honor, again, are those accounts that were black. And if those losses occurred in states or jurisdictions not visited by members of this group, then the loss of the $1,200,000 would not be an accurate loss. That would be one thing. We don't know in those spreadsheets where those losses occurred. And that was one of the two things that the appellants challenged the government on respecting the black accounts. Again, the only issue was the accounts designated as black. There's no question that those account numbers were in fact found within the custody of members of the conspiracy. But the issue was who caused the loss. Well, if the account numbers were found, where did you say they were found? They were found within the custody and control of the members of the conspiracy. Then why wouldn't the evidence support the district court's order that they should be attributable to the conspiracy? Only because the district court never ascertained where the losses occurred. Whether they in fact were, let's say, in account numbers that could have been a loss attributed. They came from China, could have been in China. Does it matter where they occurred if the conspiracy caused the loss? The question is did the conspiracy cause the loss? And as stipulated by the government and by the testifying agent, it is quite possible that other parties were responsible for some of that loss. Some parties who were not party to the conspiracy. It is stipulated in fact, and of course it caused some humor with regard to the court, that the individuals selling those account numbers were not honorable people and that it was possible that they sold them more than once and that not necessarily to the members of the conspiracy but to other individuals. Now we, yes, your honor. Did you raise a question about the amounts attributable to the black numbers? That is correct. All right. From the testimony of Agent Wimbish, the red and blue credit card numbers would account for about $600,000 in actual losses. Is that correct? That is correct. All right. If you just took half of the amount associated with the black numbers, that would get you to $900,000. Isn't that correct? Yes. So you don't have to consider all of the losses attributable to the black numbers. If you just attributed half of that, that would get you up to $900,000. Yes. Thank you. Excuse me. I didn't mean to cut you off. No, I apologize, your honor. And that is readily available in large part simply by determining and verifying where those losses occurred. If the losses occurred in an area, again, stated in a jurisdiction, and there was testimony where this conspiracy operated, in the states where it operated, if the losses occurred in other areas, then it should not be attributable to them. And, of course, there was also a questionable statement with regard to Agent Wimbish where he stated that losses that occurred prior to the conspiracy and after the conspiracy, that the particular transactions were not included. It was somewhat questionable whether, in fact, certainly if a loss was attributable or occurred prior to the conspiracy, whether, in fact, any transactions should be attributed to it, although we could not and we don't maintain if a loss occurred necessarily after because these cards were, as the government demonstrated, they were not all retrieved. And that would include those account numbers that account may have been, the cards may have been made. The government says that you did not raise the question of whether of the district courts giving reasons or not giving reasons for the amount the district courts settled upon. Is that correct? Yes, Your Honor. You didn't raise an objection to it? The parties, that is correct. They disagreed previously. They submitted various memorandum of law. No, but what I'm wondering, if you take this proceeding as a whole and there's no objection raised as to the procedures followers, Judge Hamilton's initial question indicated, so that comes before us on plain error review, and if there's no objection raised to the giving of reasons, so we have that on plain error review. And what I ask is, you know, the council has a role in these proceedings. It's so much better to have a district court alerted to what you think is deficient at a time when it can be easily corrected, rather than trying to deal with these kind of questions on appeal. You know, I'm not, I don't know whether you were counsel below or not, but, you know, plain error review really exists for a reason, and it's to protect the integrity of trial proceedings. And really, in the interest of fairness, and having objections raised before the judge who has the greater familiarity with the facts, and there's a lot that's coming up here for the first time. I see, Your Honor, my time is... No, you can go ahead. Well, I would, at first I was not counsel of record at all, but memorandum and argument were made prior to sentencing, indeed, that because the information as to location of the error attributable to the black accounts, that they should not be included in the loss. In fact, the defense counsel stipulated that they would agree to all the losses that were demonstrated and stipulated on the spreadsheets as red and blue. Thank you. Ms. Fine, we're pleased to hear from you. Thank you, Your Honor. May it please the Court and counsel, my name is Tamara Fine, I'm an assistant United States attorney. in Baltimore, Maryland, and I was the lead trial counsel both during the investigation of this case and during the various proceedings. The Court has asked us to address three issues, essentially. One was compliance with Section 3664, whether the Court and the government complied with that section. I think Judge Wilkinson has already addressed that issue in his question earlier. 3664 is really designed for a routine case. It's fairly easy to identify victims and losses in a bank robbery or in a mortgage fraud case, in a credit card case. It's much, much more complicated. And 3664 specifically references the terms, if practicable, when practicable, repeatedly throughout the provision. And in fact, it permits the Court to enter a restitution order up to 90 days after sentencing. If that additional time is needed to provide the obtaining information. The situation is exactly as the Court indicated. How is a probation officer to assimilate all of this information that the government has with regard to losses? And in this case, the District Court clearly determined after consultation with all counsel, and I remember one conference call about scheduling lasting about an hour itself, the Court set up what it felt were appropriate deadlines. The government had already, of course, provided discovery many months in advance. On February 29th, the government began to provide its work product spreadsheets in the various forms that it was obtaining. Can you explain what exactly did the spreadsheet do? Certainly. Just talk a little about the spreadsheet, because that was the main piece of documentary evidence that underlay the computation of the loss. You know, it seems to me in a case where you've got 2,000, you know, some 2,000 credit accounts that are affected here, that a spreadsheet would probably be a pretty decent way of arriving at the overall figure. But explain the spreadsheet methodology, if you would. Absolutely. I do mainly these large case and multiple defendant cases, and so the agents I work with have gotten pretty adept at beginning to call the information first from the evidence. So we're looking at the evidence seized, and we're obtaining a list of credit card numbers and any other information we get. The first six digits of a credit card number is the BIN number. It tells us what institution issued it. We then reach out to the institution, and we get a great deal of additional information, including sometimes information about the specific fraudulent charges, sometimes not. So we were in that process, and we were providing that in sort of draft forms in February of 2009. The first date that the court gave us was June 14th, and at that point we provided what we called preliminary spreadsheets It is identical to the final spreadsheet, except that we were continuing to receive information from banks, and so we were still filling in some of the fields at that time. When was the final spreadsheet done? There was a final spreadsheet, which I think is ultimately referred to as Government Exhibit 1, on the 26th, and then I had messed up how the numbers were numbered or something, and I think we resubmitted it about 9 o'clock the next morning. There was no objection. So when was that? The 26th-27th is what I did. Of what month and year? Of 2009, June. And then on June 29th, when we were having a hearing, the government provided what is termed and what is in the record as Government Exhibit 1A. This is identical to that final spreadsheet, Government Exhibit 1. The only difference is that because defense had complained, some of the defense counsel had complained, that they couldn't figure out where we'd gotten the numbers from, we added a column to provide that information. We had had the agents go back and start looking for that. So Government Exhibit 1 and 1A, in combination, are the final spreadsheet. Is that correct? That's correct. Exhibit 1A has just that one extra column. Otherwise, the two should be identical. So what is the amount of loss attributable to the black cards? I'm glad I looked that up in anticipation of that question. The black cards have $632,911.71 of actual loss. And where did you look that up? Where is that in the record? I went to the actuals. You could compute it from the documents in the record. It would take a long time. So was that computed for the court at sentencing? It was not. We did not break it out. You computed it in preparation for this? I computed it in preparation for this. So the district court at sentencing did not have that information? Did not have it, did not request it, and I don't believe that defense counsel requested it either. So how were the losses for the black cards tied to the appellant's offenses of conviction at sentencing? Well, they were all convicted of conspiracy. And so any cards recovered in the course of the conspiracy that have fraud during the period of time of the conspiracy, and I think there were only a couple of cards that had fraud that wasn't during the period of time of the conspiracy, if I recall correctly. All of those were included. The blue cards are cards where we recovered a receipt with a credit card number, where we recovered the actual credit card in some form or another, or card numbers where we have video with a transaction conducted with that card. Well, you have some evidence tying it to the fraud. We have something very concrete. The black cards were tied to the fraud as well because they're in the form of electronic or hard copy, what we call credit card dumps. And these are a piece of paper with maybe between 30 and 50 credit card numbers listed on it. And what that is is all the track data that you can read with a magnetic reader from that magnetic strip on the back of the card. And so we found those dumps, and we know that they were being used. We know because Sharice Jones testified that she was making cards from those credit card dumps and from many, many others. We know because some of those cards were actually recovered in physical form. So the card numbers from the dumps were recovered in physical form. I think there were 49 of those. So we know that they were being used. We know because if you look at the credit card dumps, and again Sharice Jones and I think Special Agent Wendish as well testify about there would be notations next to some of the credit card numbers, notations indicating who that credit card had been given to, made for. So what did Agent Wendish mean at sentencing when he or she testified that there is no evidence in the discovery corroborating loss caused by the members of the conspiracy? He said that had not been verified yet. I believe what Special Agent Wendish, what I understood him to mean, was that we did not have a receipt. We didn't have a videotape of a transaction. But what we have are credit card numbers in the possession of members of the conspiracy. We have members of the conspiracy saying that they were made into cards and used. We have on those credit card dumps, the paper ones, notations as to what the credit limits were for the cards and who those cards were made for. Because remember, when they're making the credit card, they're putting somebody's name on it. It's either the real name or the alias of one of the co-conspirators. And where can I find that in the record about the notations as to the credit limits and that sort of information with regard to the black cards? One moment. Let me see if I wrote that down. I'm trying to find it. I'm sorry. Did you say one of the agents testified about that? I believe Cherise Jones testified about the notations on the back. And I want to say that Special Agent Wendish did as well, but I'm not 100% confident of that. And I will see if I can find, if I run across that in my notes as I'm going along. I'll provide that. I apologize. Yes, Judge Hamilton. If I follow your testimony correctly, I think you will find that from the testimony of Cherise Jones, Mandy Myers, and Jeremiah Dansbury, which is found as a joint appendix at 1019 and days 20, 1019 days 20. Thank you. Thank you very much. Yes, that sounds right. I know that Cherise Jones testified in quite a bit of detail about it. So we know that the credit cards are in the black number cards, are in the possession of the conspiracy. We know that those black number cards are used because some of them duplicated blue cards and became what were known as the red cards in the spreadsheet. We know that Cherise Jones and other people testified about using those cards. And we know Cherise Jones also testified in this, I think it was in the joint appendix between 290 and 293. She said that they learned where to buy better numbers, that there is apparently honor among thieves. And that some of the cards, when they first got them, a lot of them didn't work. But they learned how to buy cards from people who were not selling them to multiple other individuals. And the credit card dumps were, in fact, obtained during this period of time, when they had sort of developed online relationships with people who were selling credit card dumps and getting ones that they had quite a bit of confidence would work. We know as well that that's true and that's supported again by something in the record. And that is if you look at any of the spreadsheets, government exhibit 1 or 1A, you will see that there is no use on a huge number of the black cards. So when we seized a credit card dump before they could use it to make cards for all of those cards, they didn't get used. If they had been purchasing cards that were being sold to other conspiracies, you would expect to see use on those black cards. And you don't see any fraud on the vast majority of the black cards. So I think that that's another thing that really supports the district court's inclusion. What claims have been preserved here? And what part of this case do you think is up there on plain error? Honestly, Your Honor, the government thinks that the entire case is up on plain error. With regard to the compliance with 3664, there was absolutely no objection to that. And the schedule the court put together more than complied with the substance of what 3664 is intending to pursue. With regard to the issue of the attachment of the final restitution worksheet, which is simply adding up from the spreadsheet all of the American Express cards. What about the statement of reasons? Right, the statement of reasons. So that was unfortunately not attached to the statement of reasons and then was within the 90 days permitted by statute was, in fact, filed under seal by the court. I think I can say with confidence it's a clerical error because three people were sentenced the day that Izzelli Signius was sentenced. Rodin, Bratton Bay, and Boaz Bratton Bay were also sentenced. Their restitution worksheets were identical except for their name as the defendant. They were all handed to the court at the same time. Your brief is insistent that the ultimate amount of loss settled upon is attributable to the conspiracy in this case. It was 1.2 million. You think the actual loss was vastly higher. We think the actual loss was vastly higher, but there is a difference between how we can proceed with regard to loss computations under the guidelines and how we can proceed with regard to restitution loss. Under the guidelines, we're allowed to estimate and extrapolate. When we're looking at restitution, we're really looking at specific victims, concrete losses. That's why on the spreadsheet we always have columns for the actual fraud loss incurred on any of the given cards. Do you think the actual loss for restitution purposes was in excess of 1.2 million? Yes, had we been able to obtain more information. As we were pursuing these sorts of cases, we were doing this case in a period of time when there had been tremendous consolidation within the banking industry. For a lot of the credit cards, we were never able to get information from the bank. If we had a receipt with $52.17, we used that. That brings me to my next question. If this is returned, would the actual loss figure be up for grabs again? Yes, it would. Would it not? If the court were to determine that there was error, that it was plain, that it affected a substantive right, and that it negatively reflected on the fairness, etc., of the judicial system, then yes, it would be up for grabs. One of the ways that this court could resolve that is to simply remand with instructions to exclude the black cards entirely if the court feels that that's appropriate. We can simply do the math and get to the amount of the non-black cards based upon items that are already in the record. The government does not believe that is appropriate because there is so much information in the record reflecting the actual use of those black cards by the conspiracy and information in the record reflecting that nobody else was using them. Because if the conspiracy didn't use black cards, you will see, as I said, hundreds of black cards that don't have any fraud loss on them. They weren't used. So it appears that Sharice Jones' testimony was correct, that they had determined sort of good vendors, honest vendors amongst thieves, for which to obtain cards that weren't being sold multiple times. They were only being sold to one group, to this group. The evidentiary foundation for the black cards was primarily what Judge Hamilton recited to you, Ms. Jones' testimony? Ms. Jones' testimony, actually there was testimony within Special Agent Wendish's testimony about the black cards. But Sharice Jones, because she was the highest level cooperator, certainly had more information than anyone else about what those were and how they were used. And I think that the court specifically, I believe it's during the Azele-Signeus sentencing, found that he accredited the testimony of the cooperators who had testified about the amount of actual loss that was being sustained. And if you look at the, aside from Sharice Jones, if you look at the testimony, the other testimony cited by Judge Hamilton as well as additional testimony in the record that we could certainly pull up, the cooperators are talking about going out and getting $5,000, $8,000 a day, running a cruise on a daily basis, going out on a daily basis. Mandy Myers alone estimated she was responsible for somewhere between $400,000 and $500,000 of loss. That's actual loss. That's actual merchandise she purchased with stolen credit cards. And so when you look at all of that testimony supporting the government's inclusion of the black numbers, when you look at the fact that the black numbers are, in fact, in the discovery, in the possession of the defendants, when you see that some of them are, in fact, used, when you look at the credit card dumps and see that there are notations reflecting that many, many more were used, were created for other co-conspirators to use, and when you look at the fact that there are a number of cards that aren't used at all, there's no use at all because when the government seized the credit card dumps, they were no longer available to the conspiracy to look at. When you look at all of those things, I don't think that there was plain error in the determination of the loss figure to include the red cards, the blue cards, and the black cards, and the actual loss sustained on all of them. So there were some black cards that you have evidence were actually used in fraudulent purchases? Yes, and those were the ones that we turned red. Okay, so they're red. They're not black then. Right. So if we had a black card... The black cards, you don't have evidence that they were actually used. What we have is on the dumps themselves notations of who they gave the card to, but we don't have a receipt, we don't have a video of someone making a purchase. So even if the court were to determine that there was error in this case and that it was plain, it does not appear that it affected anyone's substantive rights, and that's because the cases where restitution orders are reversed and have been, the Davenport case, the Davis case, all related to situations in which there was actually a legal error in the restitution. It wasn't computational error. It was a legal error. Illegal restitution was being imposed, and those were the ones that have been in the past remanded. In this case, there's absolutely no indication that illegal restitution was imposed or that, frankly, that incorrect restitution was imposed. Restitution probably was much higher, and certainly there's nothing in this long history of the court building a record on this that would lead anyone to believe that there was a miscarriage of justice, unfairness, fundamental or otherwise, or anything that would reflect badly on the judicial process. Are there any other questions? Thank you very much. Thank you. Mr. Chesilock? Yes, Ron. One thing which was a source of confusion, and there was an objection made by defense counsel, and that was reference to the black cards as black cards, when, in fact, no cards were recovered that were, in fact, black. Essentially, these were account numbers found in the possession of the conspiracy, many of which or some of which a loss occurred, but no cards were ever recovered respecting that. Again, we have the situation that there was an admission, in fact, by defense counsel, that they would gladly accept the red and the blue, but they lack sufficient evidence attributing a direct and proximate cause of those losses on the black accounts, the black account numbers, to the members of the conspiracy. The government has maintained that on some of those where there were no black account cards, in other words, none recovered, but where there was a loss that there may have been writing on some of them, but that did not verify or confirm that they, in fact, used them. Again, we have account numbers that were sold. Possibly, we don't know to whom, whether the losses occurred in those states that were visited by this group or not, and that information readily available to the government was not addressed in the spreadsheets and was not addressed by the court in its memorandum. And that is where the problem lies. It is solely with regard to the black account numbers, which were not designated as red, where no account cards were discovered that could be attributable directly to the group. The circumstantial evidence would be there if we knew the dates and the locations when and where those losses occurred. That was never provided. It was never addressed by the court. And that is where the objections lie and were made by the defense counsel in their argument to the court. Thank you. Thank you, Your Honor. We'll come down in Greek Council and move into our final case.
judges: J. Harvie Wilkinson III, Stephanie D. Thacker, Clyde H. Hamilton